**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

NERESSA CARR,                :
                            :
      Plaintiff,           :
                            :
     v.                    :      CIVIL ACTION NO.
                            :      1:05-CV-1395-JOF
BOARD OF REGENTS OF THE   :
UNIVERSITY SYSTEM OF      :
GEORGIA, doing business as    :
Kennesaw State University,     :
                            :
      Defendant.        :

**<u>OPINION AND ORDER</u>**

This matter is before the court on Defendant's motion for summary judgment [20-1]; Plaintiff's motion for leave to file excess pages [27-1]; and Defendant's motion for leave to file excess pages [36-1].

**I.    Background**

    **A.    Procedural History and Facts**

Plaintiff Neressa Carr filed suit against Defendant Board of Regents of the University System of Georgia, d/b/a Kennesaw State University, in the Superior Court of Fulton County on April 29, 2005. Defendant removed the suit to this court on May 27, 2005. Via 42 U.S.C. § 1983, Plaintiff raises due process and equal protection claims. She also contends that her

rights in her education under Title VI of the Civil Rights Act were violated. Finally, she asserts a state law breach of contract claim.

The court takes the facts from those of Defendant's Statement of Material Undisputed Facts that are not disputed. Due to the nature of Plaintiff's response to Defendant's Statement, the court finds it necessary to note that this court's Local Rule 56.1 describes the specific manner in which statements are to be disputed. On numerous occasions, Plaintiff provides no citation to the record to dispute Defendant's statements. Furthermore, Plaintiff's responses are often inapposite and irrelevant to the statement made by Defendant. The court has carefully reviewed both parties' citations to determine whether the statement or response is supported in the record. On the occasions where the court finds Plaintiff's response particularly important, the court addresses it specifically.

Plaintiff began attending Kennesaw State University's School of Nursing in the summer of 2000. On May 1, 2003, Officer Gary Washington of the Kennesaw State University Department of Public Safety was called to the Kennesaw State University bookstore to investigate a possible theft of books.[1] Officer Washington completed an incident report which documented his interviews with Assistant Manager Michael Glosup, Assistant Manager Wanda Blanar, Textbook Manager Patty Sansom, Book Buyer Kellie

---

[1]Plaintiff disputes that the issue was a "theft" of books, but rather refers to it as a "sale back" of books. Officer Washington's incident report, however, shows he was dispatched in reference to a "theft."

2

Anderson, and Mary Jo Halcik.[2] Mr. Glosup stated that Plaintiff had come to the "book buy back" trailer, and he bought back four books from her. He became suspicious, however, when he noticed that one of the books, a calculus book, had a sticker on it that indicated it had been shelved for the current semester. Mr. Glosup indicated that he was suspicious because if Plaintiff had purchased the book new and wanted to return it, she would have received a full refund with a receipt. Therefore, he could not understand why she would sell the book back for less money. Mr. Glosup and Ms. Sansom then conducted an inventory count on one of the other books sold back by Plaintiff – Financial Institutions Management – and discovered that the inventory listed twenty copies of this book, while there were only nineteen copies on the shelf. Ms. Halcik reported to Ms. Sansom that she had seen Plaintiff earlier in the day in the bookstore with the calculus book and thought it was unusual for a nursing student to have a calculus book. Two of the books sold back by Plaintiff came from the University's General Bookstore at a different location. Ms. Sansom spoke with Tim Bradley, the Manager of the General Bookstore, and learned that those books had also been placed on the shelf to be sold for the current summer semester.

Sergeant Edward Stephens reviewed Officer Washington's incident report, and on May 2, 2003, he contacted Plaintiff by telephone. Sergeant Stephens recorded this conversation,

---

[2]Plaintiff disagrees with many of the statements made by these witnesses, but provides no evidence to dispute that Officer Washington's incident report accurately reflects what these individuals told him.

and the court has reviewed the audiotape. During this initial conversation, Plaintiff at first indicated to Sergeant Stephens that the books belonged to Tamia Wilson, Plaintiff's former roommate and a student at Emory University. Plaintiff stated that Ms. Wilson had left the books behind when Ms. Wilson moved out. After Sergeant Stephens repeatedly stated that he could not understand why Ms. Wilson would have had the books when the stickers on the back of the books indicated that they had been shelved only the day before, on May 1, 2003. Sergeant Stephens then told Plaintiff that he did not believe her story. At this point in the conversation, Plaintiff stated that she got two of the books from Ms. Wilson but picked up two other books from a table in the student center when no one was paying attention to her. Plaintiff told Sergeant Stephens that she knew it was wrong to take the books from the table.

Sergeant Stephens later conducted an interview in person with Plaintiff. This interview was videotaped and recorded. The court has also reviewed the tape of this interview. During that second interview, Plaintiff said she found two of the books on a table and that Ms. Wilson gave her two of the other books because Ms. Wilson owed her money. Plaintiff again told Sergeant Stephens that she knew it was wrong to take the books from the table. Plaintiff offered to pay the rightful owners for the books. Plaintiff stated that the bookstores must have made an error as an explanation for why the books had current semester bookstore stickers on them. During his deposition, Sergeant Stephens stated that he "could never confirm that she removed the books from the general bookstore" but that he had "confirmed that she had the books [from the KSU bookstore] in her possession, and then sold them back

4

to the bookstore." Sergeant Stephens testified that the manager of the bookstore told him each of the four books sold back by Plaintiff had a sticker on the back which indicated it was shelved for the current semester. *See* Stephens Second Depo., at 35-36.[3]

After Sergeant Stephens spoke with Plaintiff, he contacted Mr. Glosup and Mr. Bradley and confirmed the information contained in Officer Washington's initial investigation report. Sergeant Stephens contacted Emory University, as well as the National Crime Information Center and the Georgia Crime Information Center, and he was not able to locate an individual named Tamia Wilson.

On May 9, 2003, Sergeant Stephens went to a Cobb County Magistrate Judge and obtained a warrant to arrest Plaintiff for the misdemeanor charges of theft by shoplifting and theft by deception. On May 13, 2003, Sergeant Stephens also filed a charge with the Office of Judiciary Programs at Kennesaw State University alleging that Plaintiff violated Sections III F and III G of the Kennesaw State University Student Code of Conduct. Those sections provided:

> III.F. Theft or Damage of Personal Property: No student shall take, sell or attempt to take or sell, damage or destroy any items belonging to student, faculty, staff, guests of the University, or student groups without the proper authorization. Nor shall any student make or attempt to make unauthorized use of the property of any other person or organization while on the KSU campus. Sale of a textbook or other item that is not one's own will be regarded as prima facie evidence of theft. Items should be turned in to a Lost and Found area.

---

[3]Thus, Plaintiff's repeated assertions that Sergeant Stephens had testified he had no basis for asserting the books has been shelved for the current semester are wholly inaccurate.

5

III.G. Theft or Damage to University Property: The taking of or malicious, unwarranted, or irresponsible destruction or damaging of items of University property (including library items), items rented, leased, or placed on the campus at the request of the institution, or items belonging to the students, faculty, guests of the University, or student groups or organizations is prohibited.

*Id*. The 2002-2003 Kennesaw State University Undergraduate Catalog and the 2002-2003 Kennesaw State University Student Handbook both contain these provisions of the Kennesaw State University Student Code of Conduct in full.[4] Prior to 2002-2003, the entire portions of Section III F and III G were contained in the Student Handbook, and the University Catalog did not contain the full Student Code of Conduct but rather directed students to the Handbook. Beginning in 2002-2003, the entire version of the Student Code of Conduct appeared in both the University Catalog as well as the Student Handbook. The 2002-2003 University Catalog also described under "Handling Student Code of Conduct Violations" that "The University Judiciary Program Homepage (which includes all rules, policies and procedures related to the Judiciary) is at http://www.kennesaw.edu/judiciary/).

The 2002-03 version of the Kennesaw State University catalogue provided:

---

[4]In her response to Defendant's Statement of Material Undisputed Facts, Plaintiff denies this statement. However, her denial is inapposite to the statement contained in Paragraph 30. Plaintiff avers that the "applicable provisions with regard to the Student Code of Conduct had been revised each year, and the handbook was not read by students, and was not necessarily the same every year." First, Defendant's statement makes no reference to whether the University's Student Handbook or Undergraduate Catalog are read by the students. Second, while Plaintiff is correct that the contents of the entire Student Handbook or Undergraduate Catalog could be revised each year, she has provided no evidence to show that Section III.F. and III.G. of the Student Code of Conduct were revised in 2002-2003.

6

> This catalog was prepared in the spring of 2002. The material presented is for informational purposes only and should not be construed as the basis of a contract between a student and this institution. While the provisions of this catalog will ordinarily be applied as stated, Kennesaw State University reserves the right to change the provision listed in this catalog including but not limited to academic requirements for graduation, without actual notice to individual students.

*Id.* The 2002-2003 Kennesaw State University Student Handbook states, "the KSU Student Handbook & Daily Planner is intended to supplement the University catalog, not replace it."[5]

On May 14, 2003, Diane Walker, Director of Judiciary Programs, wrote to Plaintiff and informed her that an administrative hearing before Dr. Nancy King, the Vice President for Student Success and Enrollment Services, would take place on June 10, 2003, unless Plaintiff requested a University Court hearing. The letter explained that the

> University Court is a panel of five people (faculty/staff and students) who will hear the witnesses and you and will then decide whether they believe your actions violated the specific sections(s) of the KSU code of conduct. They will then make recommendations to Dr. King. This is a serious matter and if you are determined to have violated the KSU code of conduct you most likely will be subject to sanctions imposed by the university. The sanctions could be anything from a reprimand up to and including suspension, or permanent expulsion from Kennesaw State University. Check the judiciary website for a more complete list of possible sanctions [web address].[6]

---

[5]Again, Plaintiff's assertions that the Student Handbook changed every year and that the students did not read the Handbook are not relevant to Defendant's statement.

[6]In response to Defendant's statement of material undisputed facts, Plaintiff repeatedly comments that there "is no way to know which judiciary policy was on the Kennesaw State judiciary website." *See* Response, ¶¶ 36-38, 40-41. Again, this is not the relevant inquiry. Both Ms. Walker and Dr. King testified as to the judiciary procedures in place at the time of Plaintiff's incident. A copy of those procedures is attached to Ms. Walker's affidavit.

7

*Id*. A list of possible sanctions for Student Code of Conduct violations was also contained in the 2002-2003 Undergraduate Catalog and University Handbook. Plaintiff chose to go through an administrative hearing rather than the University Court. Plaintiff testified that she was not aware the administrative hearing would not be recorded and was not familiar with its procedures.

Prior to the administrative hearing, Dr. King reviewed the official written reports of the Kennesaw State University Department of Public Safety staff and spoke with Sergeant Stephens. There is no testimony concerning whether Dr. King reviewed the audiotapes or videotapes of Plaintiff's interviews with the police. The administrative hearing took place on June 13, 2003, and Dr. King informed Plaintiff at the conclusion of the hearing that she was being suspended for two years. Dr. King testified that at one point in the hearing, Plaintiff informed her that the books belonged to her ex-roommate who owed her money, so Plaintiff sold the books to get back that money. Plaintiff then later stated that she found the books on a table in the student center and sold them because she needed the money.[7]

---

Plaintiff has proffered no evidence to show that their description of the procedures is incorrect. Ms. Walker did testify that she did not know whether there was any employee who had responsibility for maintaining a copy of the judiciary policies from the website, but that does not contest their description of the policies or their testimony that they were located at the web address provided to Plaintiff in Ms. Walker's letter.

[7]In her response to Defendant's statement of material undisputed facts, Plaintiff contends that she told Dr. King that some of the books were from her roommate and some were from a table. However, the portion of her deposition Plaintiff cites to support this assertion do not relate to what Plaintiff told Dr. King at the hearing.

8

Dr. King had the discretion to decide an appropriate punishment for Plaintiff. Dr. King testified that she considered numerous factors including: the fact that Plaintiff's integrity would be particularly important because she was entering the health care field, Plaintiff had changed her story throughout the investigation, Plaintiff did not take responsibility for her actions and did not show contrition, and previously Dr. King had suspended a student for three years for similar misconduct.

Dr. King sent a follow-up letter to Plaintiff on June 16, 2003, which stated:

You admitted to me that you took the books from the Student Center that were not your own and sold them to the campus bookstore through their buy-back program. This does violate Section III F of the Kennesaw State University Student Code of Conduct and I impose the following sanctions. First, this letter constitutes a written reprimand. Theft of any type, whether from individuals or the university is reprehensible and will not be tolerated. Second, you are immediately suspended from all classes at Kennesaw State University and will remain on suspension for a period of two years.

*Id*. Dr. King's letter did not specifically inform Plaintiff of her right to appeal Dr. King's decision. However, the Judiciary Policies and Procedures provided that "in cases where a student's penalty is suspension or expulsion from the University, and the student has exhausted all Judiciary remedies, the student may appeal to the President of the university within five (5) days of notification of the final Judiciary decision." Plaintiff did not make an appeal within the required time period.

There is a great deal of testimony in the record concerning whether Plaintiff knew the procedures for appealing the administrative hearing officer's decision and whether she did

9

actually try to pursue an appeal within five days. *See generally* Carr First Depo., at 40-58.

Plaintiff asserted in her deposition that she contacted Linda Johnson, secretary to Dr. Betty

Siegel, President of Kennesaw State University, the day after the hearing to see if Dr. Siegel

could consider a lesser sanction. Plaintiff, however, was unable to locate that e-mail. *See*

Carr Second Depo., at 28-29. Plaintiff then testified that she had contacted Dr. Siegel's

office after speaking with the chairman of the nursing school, Dr. David Bennett. *See* Carr

First Depo., at 54. She further stated that it was at Dr. Bennett's suggestion that she tried to

contact Dr. Siegel and dropped off a letter at her office. *Id.* Dr. Bennett testified that

Plaintiff came to see him on August 4, 2003. *See* Bennett Aff., ¶ 5. There is no dispute that

Plaintiff's first letter to Dr. Siegel was dated August 7, 2003, well after the June 13, 2003

hearing at which she was given a two-year suspension.

Plaintiff's August 7, 2003 letter to Dr. Siegel stated:

After a meeting with Dr. Nancy King on June 13th, I was suspended for a period of two years. I was suspended for picking up two books from a table in the student center and instead of turning them in to the lost and found area, I sold them to the buyback booth. I have taken full responsibility for the bad choice I made, and I am not disputing a warranted punishment. I am sure that Dr. King was not aware of the severe consequences of a two-year suspension for a nursing student. If required to sit out for two years, I would have to start from the beginning of the curriculum and repeat all of my nursing courses. Not only would I have lost three years of my life, but also I would have created a student loan debt with nothing to show for it. . . . After speaking with the chairman of the nursing department and getting support, I am writing this letter to you in hopes of getting a punishment that would prevent me from losing all that I have worked for.

10

*Id*. Dr. Siegel asked Dr. Flora Devine, the University Attorney, to take a look at the issues raised in Plaintiff's letter. Dr. Siegel testified in her deposition that she did not consider the letter to be an "appeal" under the Judiciary Policies and did not know whether it was timely. Rather, she felt that like any correspondence addressed to the President of the University, it should be considered. On August 20, 2003, Dr. Siegel informed Plaintiff that she was upholding Dr. King's two-year suspension. Plaintiff then contacted Dr. Siegel's office to say she had new information. Dr. Siegel instructed Dr. Devine to review this information. On October 24, 2003, Dr. Siegel informed Plaintiff that she was not going to change Dr. King's two-year suspension.

### B. Contentions [8]

Defendant argues it is not an entity subject to suit under section 1983. Defendant further argues that Plaintiff was not discriminated against in violation of Title VI because she has brought forward no evidence to show that students outside her protected class who committed similar infractions were subject to less severe punishment. Finally, Defendant argues that Plaintiff's state law breach of contract claim is barred by sovereign immunity.

Plaintiff contends that Defendant violated her due process and equal protection rights under section 1983 because it did not follow the proper procedures in adjudicating Plaintiff's charges and because similarly-situated white students were given less harsh sanctions. She

---

[8]The court GRANTS Plaintiff's motion for leave to file excess pages [27-1] and GRANTS Defendant's motion for leave to file excess pages [36-1].

11

further argues that Defendant breached its contract with her by failing to abide by its own judicial rules, regulations, and procedures. Finally, she avers that Defendant intentionally discriminated against her in violation of Title VI because students outside her protected class did not receive such severe sanctions.

## II.    Discussion

Before analyzing Plaintiff's particular claims, the court finds it necessary specifically to review certain factual allegations made by Plaintiff to assure that the record in this case is clear.    Plaintiff repeatedly claims that her student handbook did not contain a prohibition on selling certain textbooks back to the University bookstore.    She further posits that such a prohibition was "added" after the incident in question.    As the court explained above, however, Plaintiff's allegations take liberty with the record before the court.    The particular provisions of the Student Code of Conduct Plaintiff was charged with violating did not substantively change from the time she matriculated at Kennesaw State University to the time of the incident in question.    At all times, the Student Code of Conduct was contained in the University Catalog.    Up through the 2001-2002 school year, the Student Handbook referred students to the University Catalog for the full recitation of the Student Code of Conduct. Beginning in the 2002-2003 school year, the entire Student Code of Conduct was printed in the Student Handbook as well as the University Catalog.    As such, Plaintiff's implication – that

12

the conduct with which she was charged was not prohibited until 2002-2003 when it was "added" to the Student Handbook – is wholly misleading and incorrect.[9]

Plaintiff also repeatedly argues that there is no evidence as to which of the Kennesaw State University Judiciary Policies and Procedures were in place at the time of Plaintiff's incident or what "version" of such Policies was on the University's website. As the court explained above, however, Ms. Walker testified in her affidavit about the Judiciary Policies and Procedures in place at the time and attached a copy of such policies to her affidavit. *See* Walker Aff., ¶ 31. Plaintiff has provided no evidence at all to dispute Ms. Walker's testimony on this point. The fact that Ms. Walker testified in her deposition that she did not know who had responsibility for posting the Policies on the website is irrelevant to the matter in consideration. Plaintiff has provided no evidence to dispute Ms. Walker's testimony that the Policies were available on the University's website other than her statement that she could not locate them.[10]

Further, Plaintiff is incorrect in asserting that a student's right to appeal was at the discretion of officials at the administrative hearing. The fact that Dr. King did not specifically

---

[9]The language "[n]or shall any student make or attempt to make unauthorized use of the property of any other person or organization while on the KSU campus," was added to Section III F of the Student Code of Conduct in 2000-2001, prior to the incident in question and near Plaintiff's matriculation in the summer of 2000. *See* Walker Aff., ¶ 13.

[10]Plaintiff did testify that she could not locate a so-called "Judiciary Handbook," but Ms. Walker's letter referred Plaintiff to the University Judiciary Procedures and Policies, not a handbook.

13

advise Plaintiff of this right at the conclusion of the hearing does not mean that Plaintiff did not have the right available to her. That right is explained in the Judiciary Policies and Procedures to which Plaintiff was directed in a letter she received from Ms. Walker prior to the hearing.

Similarly, Plaintiff's assertion that no "uniform appellate rules [were] ever enacted, applied or used at the time" is wholly unsupported in the record. *See* Plaintiff's Response to Defendant's Motion for Summary Judgment, at 9. Ms. Walker's testimony – to which Plaintiff cites – indicates no such thing. Rather, Ms. Walker testified that she could recall only two or three occasions upon which a student exercised his right to appeal at the conclusion of an administrative hearing. In particular, she recalled one student who filed a notice of appeal within five days as set out in the Policies. A three-member panel was convened – as set forth in the Policies – and that panel recommended to Dr. Siegel that the sanction from the administrative hearing be upheld. Thus, Ms. Walker's undisputed testimony conclusively demonstrates that appellate rules did exist and were applied.

Finally, Plaintiff's assertion that "Defendant agreed to review the case de novo based upon a new investigation and review by a panel of three educators" is also wholly unsupported in the record. *See* Response, at 10. Ms. Walker specifically testified in the event of an appeal, the review of the panel of three educators emphatically is not a new investigation; rather, the panel is to review the decision of the administrative hearing officer based on the information before her. *See* Walker Depo., at 28-29. Ms. Walker testified:

14

> [The] president is supposed to set up a panel of three faculty members, who review the letter that the student has done, and review any notes, any letters, any evidence that was heard at the hearing and decide whether – ***it's not a new hearing*** – decide whether, based on the information that Dr. King heard, that there was a preponderance of the evidence that the student did violate it. And if so, whether the sanction that Dr. King imposed was appropriate.

*Id.* (emphasis added). Plaintiff's counsel then asked, "Do they decide whether or not the student violated the code provision?" And Ms. Walker explained, "***They don't decide it over again.*** They decide whether Dr. King had enough information to make that decision." *Id.* (emphasis added). Ms. Walker's testimony on this point could not be any more clear and explicit, and the fact that Plaintiff's counsel repeatedly cites to it for the exact opposite conclusion is puzzling to the court.

### A.  Section 1983

Plaintiff does not respond at all to Defendant's assertion that the Board of Regents of the University System of Georgia, d/b/a Kennesaw State University, is not a "person" subject to suit under 42 U.S.C. § 1983. Defendant is correct that states and state officials acting in their official capacities may not be sued for money damages under 42 U.S.C. § 1983 because they are not "persons" as defined by the statute. *See*, *e.g.*, *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989); *see also Lapides v. Board of Regents of the University System of Georgia*, 535 U.S. 613 (2002) (state is not a "person" against whom § 1983 claim for money damages may be asserted).

15

As such, the court GRANTS Defendant's motion for summary judgment on Plaintiff's due process and equal protection claims brought via section 1983.

**B.      Title VI**

Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, *et seq.* provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

*Id*. "[P]rivate individuals may sue to enforce § 601 of Title VI and obtain both damages and injunctive relief." *See Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). Section 601 bars only intentional discrimination. Numerous courts have applied the burden-shifting analysis of Title VII claims to claims brought under § 601. *See*, *e.g.*, *Freeman v. Fahey*, 374 F.3d 663, 666 (8th Cir. 2004); *Bryant v. Independent School District No. I-38*, 334 F.3d 928, 930 (10th Cir. 2003); *Peters v. Jenney*, 327 F.3d 307 (4th Cir. 2003) (applying Title VII jurisprudence to Title VI retaliation claim); *Quarles v. Oxford Mun. Separate Sch. Dist.*, 868 F.2d 750, 754 n.3 (5th Cir. 1989) (indicating *McDonnell-Douglas* analysis would apply to Title VI claim). Thus, the court proceeds to apply the familiar burden-shifting analysis to Plaintiff's claims.

Defendant argues that Plaintiff cannot establish a prima facie case of discrimination because she cannot show that similarly-situated students outside her protected group received more favorable treatment. *See Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

16

AO 72A
(Rev.8/82)

Plaintiff offers six white comparators she contends were given less harsh punishments for similar conduct.[11]

Student No. 0203-079, a white student, was given two semesters of suspension for stealing property from a roommate and student housing. Dr. King also barred Student No. 0203-079 from visiting student housing. Student No. 0203-079 had immediately withdrawn from school, was institutionalized for a mental illness which caused her to steal, and was contrite. *See* King Aff., ¶ 36.

Student No. 0506-011, a white student who stole folding tables and chairs from the student center, was given two semesters of suspension. Student No. 0506-011 "immediately took responsibility for his misconduct and expressed significant contrition throughout the disciplinary proceedings." *See* King Aff., ¶ 52.

Student No. 0405-078, a white student, was given twenty hours of community service for theft of University signs promoting Alcohol Awareness Week. Student No. 0405-078's conduct "represented a prank and he did not actually take the signs himself but merely allowed them to be placed in his vehicle." *See* King Aff., ¶ 43.

---

[11]Although Plaintiff states she has six comparators, the court could construe only five from her brief. Plaintiff did not identify these comparators during discovery. *See* Carr First Depo., at 21-27, 32 (testifying that her only comparator was an unidentified white student who committed unspecified infractions that were allegedly similar to Plaintiff's and received only "probation" from the University because his parents contacted the administration). Plaintiff identified these five comparators in her response to Defendant's motion for summary judgment.

17

Student No. 0405-104, a white student, was given one semester suspension for theft of a library laptop. Dr. King "believed this student did not intend to steal the laptop but instead had improper possession of this property when she failed to return the laptop once it was due back in the library." *See* King Aff., ¶ 46. Also, this student requested an appeal of her administrative ruling and was given a three-member panel. Student No. 0405-104 filed an appeal within the five-day time limit. *See* Walker Aff., ¶¶ 50, 52-53.

The University dropped charges against Student No. 0405-181, a white student who stole $285 in her role as treasurer of a student organization. Student No. 0405-181 resigned from her position in the organization, wrote an apology, and returned the money to Dr. John Selmon, the organization's faculty sponsor. There was, however, no administrative hearing for this student because Dr. Selmon dropped the student code of conduct charges against this student. *See* King Aff., ¶ 48.

Because the determination of whether these students are similarly situated to Plaintiff is intertwined with the determination of whether Dr. King's actions are pretextual, the court will assume that Plaintiff can establish a prima facie case and proceed directly to the pretext analysis. Dr. King testified that she imposed the sanction against Plaintiff because Plaintiff was training for the health care field which would place a premium on integrity, Plaintiff had changed her story as to the circumstances of the theft, and Plaintiff had not shown any contrition. Pointing only to the evidence with which she attempts to establish a prima facie case, Plaintiff argues these reasons are pretextual.

18

The court finds that Plaintiff has presented no evidence from which a reasonable jury could conclude that Defendant's legitimate, non-discriminatory reasons for the punishment were pretextual. The record does reflect that Plaintiff repeatedly changed her story concerning how she came into possession of the books, and she did not show any contrition. In fact, despite the language in Plaintiff's August 7, 2003 letter to Dr. Siegel wherein she purportedly admitted wrongdoing ("I have taken full responsibility for the bad choice that I made and I'm not disputing a warranted punishment"), Plaintiff continues to deny any wrongdoing on her part. In her deposition, she testified that she found two of the books lying on a table in the student center. She asked some students in the vicinity if the books belonged to them. When they said no, she took the books and sold them back to the bookstore.[12] Plaintiff stated, "when you returned books, they don't ask for your student ID. They don't ask you if those books belong to you. They don't ask you any of that." *See* Carr First Depo., at 85. She specifically testified that the books did not belong to her. *Id.* at 86. She further testified:

> Q: Why do you consider that not committing theft or stealing to take books that didn't belong to you and then selling them?
> A: I wasn't – like I said, at the buy back stand, no one asked me if these were – are these your books. Can I have your student ID. And when I put the books on the table and they told me how much that I would get

---

[12]The court notes that this testimony differs from Plaintiff's telephone and in-person interviews with Sergeant Stephens where Plaintiff asserted that she stood at the table for a long time before deciding to take the books from the Student Center and no one was around when she did take the books.

19

for the books, you know, I took the cash along with the other books that I turned in.

*Id.* at 87; *see also id.* at 88-89 ("It's a little buy back stand, you know, where you walk up. And they don't ask for your ID and they don't ask any questions. You just give them the books and they tell you this is how much the books are. This is how much you get for the books."). Plaintiff admitted that this is what she told Dr. King during the administrative hearing. *See id.* at 119 ("Q: Do you recall making any statement at the hearing about finding the books in the student center and asking the people around you if they had – if the books belonged to them? A: The way I remember, it was asked to me if that's what happened and I was able to say, yes. But I wasn't able to give explanations."). Plaintiff apparently believes that because the books were abandoned, she committed no wrongdoing by taking them and selling them back to the bookstore. Based on the foregoing, the court finds it was not unreasonable of Dr. King to conclude that Plaintiff did not display any contrition for her actions.

Dr. King's testimony was clear that she made the determination to give a two-year suspension because integrity was important in Plaintiff's chosen profession, Plaintiff changed her story, and she had shown no contrition. Plaintiff has provided no evidence to show these rationales are false. Nor has she provided any evidence to show that Dr. King did not apply the same reasoning to other students facing an administrative hearing. In fact, with respect to Student No. 0102-050, a white student who attempted to sell stolen books back to the bookstore on three separate occasions, Dr. King imposed a three-year suspension. *See* King

20

Aff., ¶¶ 31-32. As the court described above, Dr. King was more lenient in other situations because those students had shown immediate remorse and had not attempted to cover up their conduct. It is not the court's place to determine whether Dr. King's reasons are wise; rather, the court must determine whether she has applied them in a non-discriminatory manner. The court concludes that Plaintiff has proffered no evidence from which a reasonable jury could conclude that Dr. King's actions were intentionally discriminatory, and the court GRANTS Defendant's motion for summary judgment as to Plaintiff's Title VI claim.

### C. Breach of Contract

Plaintiff argues Defendant breached its contract with Plaintiff because it did not give Plaintiff a three-member panel de novo review, did not investigate the facts on appeal, and imposed a sanction before the administrative hearing. Plaintiff has alleged that various versions of the Undergraduate Catalog form the basis of her breach of contract claim. *See* Plaintiff's First Depo., at 99; Second Depo., at 30-32, 40-42, Cmplt., ¶ 27).

The State of Georgia has waived its sovereign immunity for certain contracts only. Under the state constitution, the waiver applies only to "any action ex contractu for the breach of any written contract now existing or hereafter entered into by the state or its departments and agencies." *See* Ga. Const., Art. I, Sec. II, Par. IX(c). The University Catalog, however, does not bear the indicia of a written contract. There is no agreement executed by both parties, there are no signs of an offer or acceptance, or mutually binding promises of

21

consideration. Significantly, all versions of the University Catalog at issue in the litigation contained the language:

> This catalog was prepared in the spring of [2002]. The material presented is for informational purposes only and should not be construed as the basis of a contract between a student and this institution. While the provisions of this catalog will ordinarily be applied as stated, Kennesaw State University reserves the right to change the provision listed in this catalog including but not limited to academic requirements for graduation, without actual notice to individual students.

*Board of Regents of the University of Georgia v. Tyson*, 261 Ga. 368, 369 (1991), and *Fedorov v. Board of Regents of the University of Georgia*, 194 F. Supp. 2d 1378, 1394 (S.D. Ga. 2002), cited by Plaintiff, do not aid her case. *Federov* holds that the state is subject to liability for breach of contract only if the contract is in writing. *Tyson* addresses whether a written contract can consist of multiple documents. Neither supports Plaintiff's assertion that the school's judicial policies contained in the University Catalogue or Student Handbook form the basis of a written contract between a student and the university, and the court holds that they do not under the circumstances presented here.

Finally, even if Plaintiff could show that the University Catalog constitutes a contract between her and Defendant, Plaintiff has not proffered evidence from which a reasonable jury could conclude that Defendant had failed to follow its own policies. As the court explained above, Plaintiff did not timely appeal the result of her administrative hearing. Even if Plaintiff had properly appealed, Defendant's policies specifically do not require that the three-member

22

panel investigate de novo. Rather, the panel is to review the decision of the hearing officer based upon the information before the officer.

Lastly, Plaintiff contends that Dr. King imposed a two-year suspension prior to the start of the hearing. Plaintiff bases this assertion on handwritten notes of Dr. King's which give a brief summary of the incident and at the bottom contain a notation of "suspension until Fall '05." *See* Plaintiff's Exhibit B. These notes were made before the hearing took place. In her deposition, Dr. King testified that prior to an administrative hearing, she would make a preliminary assessment of what sanction she believed to be appropriate. After considering the evidence developed at the hearing, she would then make a final decision as to the sanction. *See* King Depo., at 72-73. Plaintiff has no evidence to dispute Dr. King's testimony. In fact, Plaintiff, herself, testified that Dr. King did not announce her sanction until the conclusion of the hearing. *See* Carr First Depo., at 33 ("I had an opportunity to speak. But after I spoke, they sort of handed down their judgment."), 109-110 (sanction imposed at end of hearing). Thus, this assertion cannot form the basis of Plaintiff's breach of contract action. For the foregoing reasons, the court GRANTS Defendant's motion for summary judgment on Plaintiff's breach of contract claim.

## III.   Conclusion

The court GRANTS Defendant's motion for summary judgment [20-1]; GRANTS Plaintiff's motion for leave to file excess pages [27-1]; and GRANTS Defendant's motion for leave to file excess pages [36-1].

23

The Clerk of the Court is DIRECTED to DISMISS WITH PREJUDICE Plaintiff's complaint.

**IT IS SO ORDERED** this 8th day of December 2006.

s/ J. Owen Forrester
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)